THE CITY OF CHICAGO, Plaintiff, v. ELZIE HIGGINBOTTOM *et al.*,
Defendants-Appellees (Vanice Billups *et al.*, Intervenors-Appellants).

First District (6th Division)   No. 1—89—3165

Opinion filed June 14, 1991.—Modified on denial
of rehearing October 4, 1991.

Mary Pennington Anderson, and Geraldine Soat Brown, of Miller, Shakman, Hamilton & Kurtzon, both of Chicago, for appellants.

James C. Murray, Jr., Patrick J. Lamb, and Andrew M. Varga, all of Katten, Muchin & Zavis, of Chicago, for appellees.

JUSTICE EGAN delivered the opinion of the court:

Vanice Billups, Robert E. Dawson, William L. Morrison and Howard Zar (the Intervenors) appeal from an order denying them attorney fees allegedly due them after they intervened in an action brought by the City of Chicago for building code violations. We affirmed the judgment, and the Intervenors filed a petition for rehearing.

On May 8, 1975, the City of Chicago (City) filed a two-count complaint alleging eight violations of the Municipal Code (the Code) existed in a 24-unit apartment building (the Building) at 4710-18 South Woodlawn Avenue in the Hyde Park-Kenwood neighborhood. Named as defendants were the then-owner, Edwin E. Bell and the mortgagee, Franklin Savings Association. On June 13, 1975, following an interior inspection, the City amended its complaint to allege 40 more violations of various sections of the Code. These violations involved the Building's plumbing, electrical wiring, plaster walls, roof, rear porches, and the presence of vermin. The City sought fines for the violations and an injunction to correct them.

From 1975 to 1983 as the Building was bought and sold several times, former owners were dismissed as defendants and new owners entered their appearances. The court entered numerous mandatory orders to repair and secure the Building and to bring it into compliance with the Code.

On November 21, 1979, the court found that the Building was unfit for human habitation, and ordered the Building vacated and boarded up. The order required the owner to keep the premises boarded and secure to prevent the entry of unauthorized persons. A similar order was issued on December 21, 1982, against another successor-owner. The Building had been unoccupied for several years.

On April 29, 1983, the defendant, Elzie Higginbottom, entered his appearance. In a motion to vacate an order which required an interior inspection of the Building before August 15, 1983, it was represented that the defendant had recently purchased the Building and had applied for financing to the Federal Department of Housing & Urban Development (HUD) to renovate the Building; the application had been tentatively approved.

On August 26, 1983, seven neighbors residing within 1,200 feet of the Building, including the Intervenors, petitioned the court to intervene and moved for the removal of debris and hazards and to secure the Building. They alleged that the Building failed to remedy violations of both State law and the Code. They prayed that the Building be promptly rehabilitated or demolished; and that they receive attorney fees pursuant to section 11—13—15 of the Illinois Municipal Code (the Act) (Ill. Rev. Stat. 1983, ch. 24, par. 11—13—15).

The hearing on the petition to intervene was continued by Judge Frank Sulewski from time to time for 14 months. During that time the Intervenors filed an amended petition to intervene, alleging that the Building failed to comply with the electrical and fire provisions of the Code and that the defendants had failed to remedy the violations. It further alleged that the Building was a public and private nuisance and sought its rehabilitation or demolition and reimbursement of attorney fees. On October 22, 1984, Judge Sulewski granted the petition to intervene.

During the 14-month period between the filing of the petition and the order granting leave to intervene, numerous status hearings were held at which the Intervenors were represented by counsel and participated. For example, at a status hearing held August 26, 1983, the day the petition for leave to intervene was filed, Vanice Billups, an Intervenor, testified that a gate in front of the Building was chained but that children could still get through. The attorney for the defendant referred to the inspector's report that the chain-link fence was intact. The judge, reading from the inspector's report, noted that the catch basin was not secured and that debris had not been removed. The assistant corporation counsel asked for and received an order to secure the catch basin and for an interior inspection of the property. At a later hearing, the assistant corporation counsel asked for and received an order that the defendant was to provide a guard for the Building.

Between April 1983 and November 24, 1986, the Intervenors' attorney, the City and the defendant appeared approximately 30 times. During those hearings a building inspector testified on a number of occasions as to the progress or lack of progress he observed. The

defendant's attorney kept the court informed as to the prospective loan he expected to receive from the Illinois Housing Development Authority (IHDA). Rehabilitation of the Building began in July 1985 and was finished before November 24, 1986. We have been informed that the Building is now fully occupied.

Procedurally this is a confusing case. Four different judges participated in varying substantial ways from the time the defendant appeared in April 1983. The first was Judge Frank Sulewski, who conducted hearings over a 14-month period and ultimately granted the petition for leave to intervene. The record contains transcripts of 14 hearings before Judge Sulewski between August 15, 1983, and April 1, 1985. He recused himself when he discovered that the case had been pending in the housing division of the circuit court while he was an assistant corporation counsel assigned to that court division. The case was then assigned to Judge John Tully, who also conducted several hearings and who entered summary judgment for the Intervenors and ordered demolition of the Building. That order was later vacated by Judge Tully. The record contains transcripts of 14 hearings before Judge Tully between June 3, 1985, and June 14, 1988.

We have compared the dates of transcripts in the record with the dates of transcripts listed by the parties in letters to Judge Consuelo Bedoya. The list submitted by the Intervenors refers to 15 missing transcripts. Two of those fifteen transcripts are part of the record. Judging from the dates of the other missing transcripts, we conclude that those hearings were before Judge Tully.

The Intervenors' petition for fees was later assigned to Judge Edward Burr. The record contains transcripts of two hearings before Judge Burr; only one is pertinent. That hearing was heard on February 15, 1989. Judge Burr said that he had read everything in the file. However, he had not read the transcripts of the previous hearings. He ruled that the Intervenors were entitled to some attorney fees.

Before Judge Burr conducted a hearing to determine the reasonableness of the fees, the matter was assigned to Judge Consuelo Bedoya. On September 29, 1989, she entered the order denying attorney fees from which the Intervenors appeal.

In their briefs, the Intervenors did not maintain that Judge Bedoya acted beyond her power; nor did they maintain that her decision was against the manifest weight of the evidence. Instead, they maintained that her decision was based on an error of law in that she allegedly misread the case of *Launius v. Najman* (1984), 129 Ill. App. 3d 498, 472 N.E.2d 170. During oral argument we asked the attorney for the Intervenors if it would be appropriate to remand the case if

we determined that the Intervenors' claim was correct that Judge Bedoya had acted under an error of law. The Intervenors' attorney insisted that we should rule that they were entitled to fees as a matter of law. Although the argument that Judge Bedoya's decision was against the manifest weight of the evidence was not properly in the Intervenors' brief, we have decided to consider it. Consequently, in order to pass on that argument, we have been required to review all of the transcripts of all of the proceedings in the record, the pleadings, two depositions, a transcript of a hearing before a community group and to take judicial notice of the case of *Greer v. Illinois Housing Development Authority* (1986), 150 Ill. App. 3d 357, 501 N.E.2d 723, *aff'd* (1988), 122 Ill. 2d 462, 524 N.E.2d 561. We have not read all of the memoranda of law submitted by the parties in the trial court.

Since it is Judge Bedoya's ruling which is in issue, we will disregard the finding of Judge Burr. The record is clear that Judge Burr did not read the transcripts of the previous hearings. Contrary to the Intervenors' argument, the record is not clear that Judge Bedoya did not read the transcripts of the previous hearings.

The defendant asks for affirmance on two grounds: first, he argues that the Intervenors did not perform any services which were not also performed by the City of Chicago; second, he contends that the Intervenors have not paid nor will they be required to pay any of the fees; that the Intervenors are not the real parties in interest; and that the real party in interest is the Southeast Chicago Commission (SECC). An analysis of those arguments requires an examination of the relation between the attorney for the Intervenors, the Intervenors and the SECC.

The trial attorney for the Intervenors is a former employee of the SECC. (For the purpose of distinction and brevity we will refer to her as the Trial Attorney. We will refer to the Intervenors' appellate counsel as the Appellate Attorney.) She testified at her deposition that she was contacted by the then director of the SECC in June or July 1983. He informed her that several persons living near the Building, who were members of the SECC, were concerned about the delay in correcting the violations of the Building. They wanted the Building rehabilitated or demolished. She contacted those persons and entered into an agreement with the seven original intervenors. (Three later withdrew.) She testified that under the agreement she was to represent them and not the SECC. Her hourly rate was $100. The SECC would pay her $50 per hour. The Intervenors would never be required to pay any of her fees.

On May 5, 1988, she filed a petition for services rendered beginning July 10, 1983, before the petition for leave to intervene had been filed on August 26, 1983, for services rendered before the petition to intervene had been allowed on October 24, 1984, and for services rendered until March 7, 1988. (The City's complaint had been voluntarily dismissed on November 24, 1986. The City building inspector testified that the Building was in complete compliance with the City's Building Code; the City's complaint was dismissed; and Judge Tully granted the defendant's request to occupy the Building.)

The Intervenors' claim for fees is based on section 11—13—15 of the Act (Ill. Rev. Stat. 1983, ch. 24, par. 11—13—15), which provides that any owner or tenant of property within 1,200 feet of other property which is in violation of municipal ordinances may maintain an action to prevent or correct the violations. The Act further provides that, if the court finds that the defendant has engaged in any of the actions prohibited by the ordinance, the court "shall allow a reasonable sum of money for the services of the plaintiff's attorney."

The right of an adjacent property owner to attorney fees was circumscribed in *Launius v. Najman* (1984), 129 Ill. App. 3d 498, 472 N.E.2d 170, in which the City of Chicago filed an action seeking to enjoin the defendants from operating a parking lot in violation of an ordinance. The plaintiff then filed a separate action as owner of property within 1,200 feet of the defendants' property. The plaintiff's complaint alleged the same violation as alleged in the City's complaint and sought injunctive relief, damages and attorney fees. A settlement was reached between the City and the defendants permanently enjoining the defendants from operating a parking lot on the property. Subsequently, the plaintiff and the defendants proceeded to trial on the plaintiff's action for damages and attorney fees. The trial court denied the plaintiff's request for attorney fees on the ground that its action was duplicative of the City's action. The appellate court affirmed the denial of fees.

■ We judge that implicit in the Act and in the cases construing the Act is the requirement that the adjoining property owners must establish, at least, a substantial contribution, independent of the actions of the municipal authorities, to the ultimate success in correcting or preventing violations of the municipal ordinances. That means, in this case, that the Intervenors must establish that their efforts, independent of the City, substantially contributed to the defendant's ultimate rehabilitation of the Building.

It would unduly lengthen this opinion to attempt to recite everything that occurred at each hearing. The hearings were relatively in-

formal, even free-wheeling on occasion, often heated and sometimes acrimonious. Counsel often testified; so did a nonintervening neighbor. We will discuss what we deem to be pertinent hearings.

On August 15, 1983, the Trial Attorney appeared but did not file her petition to intervene, apparently because the court file was missing. It was represented that the Northeast Planning Commission had recommended approval of financing by HUD for the defendant's rehabilitation of the Building. Judge Sulewski expressed strong feelings about the length of time the case had been pending and the fact that numerous owners had been in and out of the case. The building inspector said that the interior inspection had been made through locked gates and that the Building was secured. The Trial Attorney was permitted to ask questions of the building inspector, who testified to an accumulation of debris. She also testified as to the amount of debris and asked for its removal. The attorney for the defendant agreed, and the judge ordered the debris removed and the grass and weeds cut.

At the next hearing, on August 26, 1983, when the petition to intervene was filed, Judge Sulewski said he would get compliance with his orders or he was "going to tear this building down." The assistant corporation counsel asked for and secured an order to secure the catch basin and for an interior inspection of the premises.

On October 17, 1983, the defendant had a building permit, but HUD had not yet acted on his application. The refuse had been removed, the weeds cut, and the Building boarded and locked.

On January 9, 1984, it was established that the Building was 80% gutted. It should be pointed out that rehabilitation under Higginbottom's plan required the gutting of the entire Building interior. The exterior walls were to remain. If the Building were to be demolished, Higginbottom could not develop the Building under his plan because the changes in the zoning laws requiring yard set backs and off-street parking would not make his development feasible. The Building originally contained 44 units. Higginbottom's plan involved deconversion to 27 units. At a later hearing the assistant corporation counsel asked for and received an order requiring the posting of a guard at the Building.

On June 11, 1984, Higginbottom informed the court that he had received a firm commitment from the Federal Housing Authority; he had a guard stationed at the Building; and he had boarded up the Building. The Trial Attorney conceded that the Building did look "considerably better." She did express reservations about the guard at the Building. She also expressed dissatisfaction with the delay in

Higginbottom's acquisition of financing. Higginbottom told the judge that he would have received approval from the Federal Housing Authority (FHA) if the SECC had not sent "so many negative letters" to the FHA.

The Trial Attorney said that she did not see how any reference to the SECC was relevant; the SECC was "not before the court." She also said, "We have no way of knowing whether it's true." We do not agree that Higginbottom's statement to the court was not relevant and that the SECC was not "before the court." The SECC was underwriting the Intervenors' claim. We note also that on August 15, 1983, a nonintervening property owner, an attorney who appeared at several hearings, told the judge that he was "represented by a community group *** the Southeast Commission."

In the Intervenors' petition for rehearing, we have been informed that the Trial Attorney meant she had no way of knowing that the "negative letters" sent to the FHA had any effect on the FHA's approval; she did not mean that she had no way of knowing whether the SECC had sent "negative letters."

On January 2, 1985, the Trial Attorney told Judge Sulewski that she had spoken to the IHDA; that she had a long discussion with the director and a number of his associates and that IHDA intended to hold a community meeting before the final decision on funding would be made.

On January 7, the attorney for Higginbottom produced a letter from the IHDA which indicated that a bond sale would take place on January 25, 1985, and that the proceeds would be used to finance developments including the one for the Building. The letter also indicated that there had "been activity by the intervenors and the Southeast Chicago Commission." The Intervenors and the SECC had requested that the IHDA not fund the commitment it had already made to Higginbottom. The Trial Attorney told the judge that she and representatives of the SECC had met with IHDA to express their "concerns that perhaps these were not the appropriate buildings in that area to spend" money on. *The IHDA informed her that it did not intend to fund the Building until the IHDA had had an opportunity to meet with the community and to hear the community's concerns.* She said that, if Higginbottom felt that that constituted opposition, she was sorry. She added, "It's our community. We have a right to talk about it."

A meeting of the Kenwood Open House Committee was held on January 10 at which the Trial Attorney said that *some of her clients wanted the Building torn down* but that some of her clients wanted

the Building rehabilitated and some wanted the Building rehabilitated partly as "market rate" housing and partly "section 8," that is, housing which would be affordable to persons with lower incomes. Higginbottom also spoke on behalf of his proposed development of the Building and two other nearby pieces of property on Ellis Avenue. His proposed development was for all section 8 housing. Elaine Billings, a staff member of SECC, spoke out in opposition to Higginbottom's proposal. She said, *"We are of the opinion that the buildings have outlived their usefulness and should be taken down."* (Emphasis added.) Billings, it should be noted, appeared later at several hearings in the circuit court and on at least one occasion expressed her opposition to any delay. Mr. Beal, the executive director of SECC, also appeared at a number of hearings. He also addressed the court on at least one occasion.

On January 28, 1985, a representative of the IHDA informed Judge Sulewski that the bond sales used to finance Higginbottom's property had been completed. He said that the bonds would be funded on February 21 and that Higginbottom would receive his money on March 23. He referred to a case in the chancery division which he hoped would be resolved before March 23. The case to which he referred was *Greer v. Illinois Housing Development Authority*, in which residents of the Kenwood neighborhood sued to block the IHDA from following through on its approval of assisted mortgage financing for the Building and two other properties owned by Higginbottom on Ellis Avenue. A principal claim of the plaintiffs was that the IHDA had approved Higginbottom's plan improperly because it was designed 100% for low-income families. Another claim was that three buildings, including the Building in the case before us, would be in violation of the Code, if built as planned. The plaintiffs in *Greer* were represented by the Trial Attorney as well as the attorneys who now represent the Intervenors in this court. It was later disclosed that she had received the permission of the Intervenors to represent the plaintiffs in *Greer*.

The circuit court entered judgment in favor of Higginbottom, and the plaintiffs appealed. The appellate court reversed the circuit court (*Greer v. Illinois Housing Development Authority* (1986), 150 Ill. App. 3d 357, 501 N.E.2d 723), and the supreme court affirmed the appellate court (*Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 524 N.E.2d 561). Since the judgment of the circuit court had not been stayed pending appeal, however, the IHDA had disbursed the funds to Higginbottom.

On March 25, 1985, the parties informed Judge Sulewski that the circuit court had ruled in favor of the defendant but that the formal

order had not been entered. It was represented that IHDA and HUD were preparing a closing and that the closing was anticipated within two weeks. Higginbottom had a permit approved by the City. The Trial Attorney told the judge that she was there on two motions: to strike the defendant's answer "for failure to conform to the Code of Civil Procedure" and for summary judgment. Judge Sulewski expressed puzzlement about what relief she was seeking in view of the fact that Higginbottom had prevailed in the circuit court. It is apparent from other remarks by the Trial Attorney that she was not waiving any claim for demolition. The attorney for Higginbottom pointed out what he deemed to be inconsistent positions on the part of the Intervenors. He said they were in the housing court pressing him to have the Building rehabilitated while they were in the chancery court trying to block him.

On April 1, 1985, the Trial Attorney withdrew her motion to strike the defendant's answers and amended the complaint to remove three of the Intervenors.[1] She argued her motion for summary judgment and asked that the Building be either rehabilitated or demolished within 30 days.

On June 3, 1985, the attorneys for the parties informed Judge John Tully of the history of the case. The attorney for the defendant told the judge that the IHDA had committed to a $2.3 million mortgage on the Building. The Trial Attorney and Elaine Billings both expressed dissatisfaction with the pace of Higginbottom's progress. The Trial Attorney insisted on proceeding on her motion for summary judgment and her prayer for demolition.

On June 10, 1985, another hearing was conducted by Judge Tully on the Intervenors' motion for summary judgment. He denied any claim for damages. He held that since the defendant had admitted the violations of the Code in his answer, *the Building was to be demolished*. Colloquy ensued between Judge Tully and counsel. A staff attorney for IHDA testified that IHDA would consent to an "early start" of construction, that is, before the closing. The order entered the following day granted summary judgment and ordered demolition; it denied damages.

On July 15, a city inspector testified that there were five men working on the Building. The Trial Attorney asked if there was a guard at the Building. The inspector said that there was no guard.

---

[1] She later told Judge Bedoya that those Intervenors withdrew "in no small part" because of allegations of racial prejudice made by Higginbottom.

The attorney for the IHDA again testified; he identified a letter as IHDA's approval for early work. *It was established that the closing could not take place while a demolition order was outstanding.* On July 17, Judge Tully vacated the order of summary judgment and demolition.

On January 6, 1986, the Trial Attorney informed Judge Tully that she had engaged in settlement discussions with Higginbottom's attorney. She said, "We would like our actual expenses which were approximately $10,000" as of October 1, 1985. The $10,000 was broken down into $8,000 legal fees and $2,000 expenses.[2] It was represented that the Building was 40% complete. The completion date was estimated to be in May or June of 1986. Judge Tully said that ultimately it might be the judge who would set the fees.

On May 5, 1986, the parties advised Judge Tully that a tax deed had been issued on the property and that Higginbottom was in the tax court attempting to have the tax deed vacated.

On June 30, 1986, the attorney for Higginbottom informed Judge Tully that the tax deed dispute had been resolved. The Trial Attorney again informed the court that she had been attempting to settle the issue of expenses and fees with Higginbottom and that the original sum that she had asked for was $10,000. She pointed out that since the offer had been made she had participated in several hearings and that she had "incurred considerably more expenses." The attorney for Higginbottom expressed the view that the SECC had paid for the Intervenors' lawsuit as well as the *Greer* lawsuit and that since the Intervenors were not out of pocket they were not entitled to attorney fees. The Trial Attorney said that any agreement which existed between her and the Intervenors was a matter of attorney/client privilege and she would not disclose it. She said that as soon as a certificate of occupancy was issued by the City the Intervenors would dismiss the case, provided the fee dispute had been resolved. It appears that work had been halted on the Building because of the tax deed problem.

On July 14, the Trial Attorney again told the judge that she was seeking a settlement with Higginbottom's attorney and that she still sought a total of $10,000 for legal fees and expenses. Higginbottom informed the judge that he would not pay it. The Trial Attorney

---

[2]The petition for fees subsequently filed in May 1988 claimed $54,255 in attorney fees.

wanted to know whether he did not want to settle the case at all or because he thought their offer was too high.

On September 29, Higginbottom informed the judge that the estimated date for occupancy by tenants was November 1. His attorney said that there did not appear to be any chance for a settlement with the Trial Attorney, who again raised the question of the sufficiency of the guards at the Building. She said that the guards did not appear to be very professional or very watchful. She said that "it was only when [Higginbottom's] feet were to the fire [that] he started to rehabilitate the building." She added, "I really believe that far from preventing the rehabilitation of the building, we were instrumental in getting it started and thanks to Your Honor."

On November 24, 1986, the building inspector testified that the Building was ready for occupancy. Judge Tully granted permission to occupy the Building, and the City dismissed its complaint. The City expressed a willingness to forego fines, but the Trial Attorney objected, and the court called for briefs from both sides on the question of whether a fine should be imposed.

On September 10, 1987, a hearing was conducted on the question of whether a fine should be imposed. At that time the Trial Attorney said that the reason she submitted a memorandum on the issue of fines was that the judge requested the memorandum. She said that it "is not obviously our issue, it's the city's issue." That statement is contrary to the position she had taken on November 24, 1986, when the City dismissed its complaint and expressed a willingness to forego fines. The Intervenors' petition for rehearing makes no reference to those contrary statements by the Trial Attorney.

On January 14, 1988, she continued to argue for and request a fine. The following occurred:

"TRIAL ATTORNEY: This lawsuit involves four clients who all live in the community, one of whom is black, all of whom want an integrated community, all of whom only wanted a building which had been derelict and vacant for almost ten years either rehabbed or torn down. The judge clearly stated and *we clearly state that we do not blame your client for anything that happened before 1983*. But you bought the building knowing exactly the condition that it was in, and from that point on, as you well know, when he buys the building, he buys the condition of the building.

MR. MURRAY [DEFENDANT'S ATTORNEY]: Are you telling me my client by virtue of buying and rehabbing a building is guilty of everything that occurred prior to 1983? And the

fact that it was vacant since 1983 because in fact the building was rehabbed. I mean, this is ridiculous.

TRIAL ATTORNEY : That's exactly what I did not say. *No one blames your client for what happened before 1983.* But when he bought the building in 1983 he became responsible for it, and for almost three years he didn't—

MR. MURRAY: He rehabbed it.

TRIAL ATTORNEY: After three years. After three years.

MR. MURRAY: *So your concern is because we didn't do it fast enough?*

TRIAL ATTORNEY: *That's right. That's exactly right.* Especially since your client came into court—

MR. MURRAY: And then the other part of the community that you don't represent is out there filing lawsuits to prevent us from getting the funding in order to rehabilitate it. That's the other half of your clientele." (Emphasis added.)

On April 5, 1988, the parties stipulated to the withdrawal of the Intervenors' complaint for damages and Higginbottom's motion for summary judgment. The Intervenors retained the right to claim attorney fees for services rendered on the damages claimed.[3]

On September 29, 1989, before Judge Bedoya, the defendant objected to any fees for the same two reasons he advances here: The Intervenors did not do anything that the City had not already done, and the Intervenors were not entitled to attorney fees because they had not paid any fees. At that time the Trial Attorney told Judge Bedoya that the $10,000 offer of settlement that Higginbottom had then made was not enough. She told Judge Bedoya that, after discussing the matter with the executive director of the SECC, she agreed to take the case with the understanding that there was a possibility of recovering fees under the Act. The judge asked her specifically if there was an agreement whereby the SECC would get any of the attorney fees. The Trial Attorney answered, "We did not discuss the matter." She said that there was "no agreement whatsoever"

---

[3]By our estimate of the hours claimed in the petition for fees from November 26, 1986, until March 7, 1988, the last date claimed by the Intervenors, the Intervenors claimed an amount in excess of $20,000 for work done during that period. We have not estimated the number of hours claimed for work done before the petition for leave to intervene was filed nor for the work done before the petition for leave to intervene was granted. Judging from remarks made before Judge Bedoya, we conclude that Judge Burr's order granting fees excluded fees for the period after November 26, 1986, and that the Intervenors do not now take issue with any order denying fees for that period.

whereby the SECC would be "reimbursed." The judge asked if she was representing, as an officer of the court, that "not one penny of those funds would go" to the SECC. The Trial Attorney replied that she had never discussed the matter and that it was something she would have to discuss with her clients and with the SECC. When the judge asked why she would need to discuss it if there was no expectation of the money going back to the SECC, the Trial Attorney answered that as a member of the community which was greatly benefited by the activities of the SECC she might well wish to reimburse the SECC. But, she said, she did not have an agreement to that effect. She did not know what she or her clients might decide to do with a fee award and added, "I honestly do not and there is no agreement about that."

The judge rejected that part of the defendant's argument concerning payment of fees by other parties and, in doing so, placed great reliance on the representation of the Trial Attorney "as an officer of the court that such agreement does not exist."

We note that the Trial Attorney testified at her deposition as follows:

"MR. LAMB [DEFENDANT'S ATTORNEY]: Is there an oral agreement between you and the Southeast Chicago Commission regarding attorney's fees in this matter?

A. Yes, there is.

Q. When was that agreement made?

A. Sometime in June or July 1983.

* * *

Q. What is the substance of the agreement regarding the fees?

A. That $50 of my time and expenses would be advanced by the commission, billed monthly and paid monthly, *and that should a fee recovery be had in the case, that the commission would be reimbursed from that fee recovery.*" (Emphasis added.)

Judge Bedoya then denied the petition for fees for reasons we will discuss later.

In our first opinion, we expressed puzzlement about what appeared to be two contradictory statements by the Trial Attorney. "Reimburse," to us, means "pay back." (Webster's Third International Dictionary 1914 (1981).) In the petition for rehearing, the Appellate Attorney for the Intervenors maintains that when the Trial Attorney told Judge Bedoya that the SECC would not be "reimbursed" by her from any fee award, she meant that she had agreed to "reimburse"

the SECC for what it had advanced her but not for anything above that amount. She also points to the fact that the same lawyer who took the Trial Attorney's deposition represented Higginbottom before Judge Bedoya and did not take issue with her statement before Judge Bedoya. This, she contends, illustrates the understanding of the parties.

█ We turn now to the arguments of the parties. Prefatorily, we reject the defendant's argument that the decision of a judge granting or denying attorney fees under the provisions of the Act is discretionary. If the complaining adjoining landowner establishes that a violation of the municipal ordinances has been committed by the defendant, the granting of attorney fees is mandatory. *Launius*, 129 Ill. App. 3d at 501.

We also disagree with the suggestion or implied argument of the defendant that the motives of the Intervenors and their relation with the SECC alone should necessarily bar them from recovery of fees.[4] It is true that the Intervenors and the SECC, through the Trial Attorney, spoke with one voice and that the positions of the Intervenors and the SECC were identical. A fact finder could reasonably conclude that the position of both the SECC and the Intervenors was rehabilitation under the plan approved by the SECC or no rehabilitation at all and demolition. But the fact that their positions were identical does not necessarily imply a sinister motive. We do believe, however, that we may consider the actions of the SECC and its relation to the Trial Attorney and the Intervenors in determining whether the ultimate result, that is, a rehabilitated building, was due to the Intervenors' efforts.

At this point it is necessary to isolate the issue and, for clarification, to revert to the hearing before Judge Bedoya. In their brief in this court, the Intervenors argued that Judge Bedoya misread *Launius*. As the issues were presented to her, we judge that she did not misread *Launius*. It was pointed out to her that the Act grants fees to an adjoining property owner who establishes that the defendant has engaged in violations of municipal ordinances. The Intervenors argued that they had established violations because the Intervenors' complaint alleged that the Building was in violation of the ordinances, and in his answer to the petition the defendant admitted that the Building was in violation; therefore, the Intervenors had established the violations and met the requirements of the Act. At the

---

[4]We are not referring to the fact that the SECC paid the fees.

same time, the Trial Attorney told Judge Bedoya that Judge Burr had made a finding that the Building was in violation of the ordinances because the City had filed a verified complaint alleging code violations and no one had ever refuted those verified allegations. Consequently, Judge Bedoya was being told that the defendant was admitting to the same violations as alleged in the Intervenors' complaint that had previously been alleged in the City's complaint and admitted. Therefore, we conclude that Judge Bedoya, in ruling as the issues were presented to her, was not at variance with *Launius*.

In the petition for rehearing, the Appellate Attorney for the Intervenors maintains that they did argue before Judge Bedoya that their activities compelled rehabilitation. She points to the petition for attorney fees and the reply memorandum. (The Trial Attorney did not argue orally before Judge Bedoya that the Intervenors' efforts expedited rehabilitation.) The only reference to the effect of their activities is in a passage in the reply memorandum in which they refuted the defendant's argument that fees should be denied unless the Intervenors were the "winners" in the litigation. The Intervenors countered as follows:

> "Defendant would have the award of attorney's fees conditioned on a plaintiff's winning, whatever that means, but the statute requires only a finding that defendant violated the Building Code. The Court made that finding on June 11, 1985. [The summary judgment and demolition order of Judge Tully.] *That finding is all that the statute requires as a prerequisite to a plaintiff's entitlement to fees.*" (Emphasis added.)

The Intervenors then added the following:

> "Even if defendant's additional requirement of 'winning' were appended to the statute, Intervenors can comply with it: their petition prays in the alternative that the Building be demolished or rehabilitated. Intervenors 'won' both of those goals in succession: *the Court's later-vacated demolition order inspired the defendant to begin the promised rehabilitation of the Building.*" (Emphasis added.)

Therefore, the thrust of the Intervenors' argument before Judge Bedoya was that the defendant had admitted the allegations of violations of the Building Code and was therefore liable for fees. The additional argument that their efforts hastened the rehabilitation was presented arcanely, to say the least. In any event, it is inescapable that in the petition before Judge Bedoya the Intervenors' entire claim was based on the finding by Judge Tully that the defendant was in violation of the municipal code and, alternatively but weakly, that the or-

der did expedite rehabilitation.

We will first consider the alternative argument that the record establishes, as a matter of law, that the Intervenors substantially contributed to the *timely* rehabilitation of the Building.

■ The Building had been in violation for eight years when it was purchased by Higginbottom, whom the record shows and the Intervenors concede to be a respected and successful developer of previously run-down property. And yet, only two months after he appeared, the property owners who had been quiescent for eight years importuned the executive director of the SECC for assistance in forcing either rehabilitation or demolition. According to the Trial Attorney some of the Intervenors wanted demolition; so did Elaine Billings, the representative of the SECC. The Trial Attorney told the court that the Intervenors acted because Higginbottom, for whom they had high hopes because of his reputation, had not moved as quickly as they had anticipated. A cynical but nonetheless reasonable fact finder could conclude that it was the appearance of a successful developer of section 8 property that spurred them into action.

The Intervenors point to the demolition order that Judge Tully entered at their insistence as proof that they expedited the ultimate rehabilitation of the Building. We do not understand why they would rely on that hollow victory. At the time the order was entered, Judge Tully had been in the case approximately one week. He granted the motion for demolition solely because the defendant had admitted that the Building was in violation of the ordinances, something which everyone knew to be a fact, even long before the defendant first appeared. The defendant bought the property for the express purpose of correcting the violations; he could not deny their existence. Under the Intervenors' reasoning, Judge Sulewski could have properly ordered the demolition immediately after the defendant filed his answer admitting that which could not be denied. At the time the order of demolition was entered, the IHDA had already committed to a $2.3 million mortgage on the Building and would agree to permit early start of construction before closing. In our judgment, under the circumstances, the drastic remedy of a demolition order represented an abuse of discretion. More important, it was established that there could be no closing while the demolition order was pending. Therefore, the demolition order slowed, not hastened, rehabilitation.

In the petition for rehearing, the Appellate Attorney for the Intervenors persists in her contention that it was the demolition order that goaded the defendant into a start of construction before the actual closing. Higginbottom applied for an "early start" of construction

four days before the hearing on the motion for summary judgment. The Appellate Attorney argues that it was the mere filing of the motion for summary judgment that prompted the application for an early start. She further argues that the demolition order "forced Higginbottom to begin construction in order to vacate the Order by the next status date of July 15, 1985." We find this argument very unappealing. We adhere to the view that the order of demolition was an abuse of discretion. To credit an invalid order as support for legal fees because it made the defendant move faster, if it did, conjures up the analogy of crediting a police officer for obtaining a confession more quickly by using a cattle prod. The metaphor used by the Trial Attorney—"[Higginbottom's] feet were to the fire"—was most appropriate. In sum, we reject the Intervenors' argument that the order of demolition could be used to support an award of fees to them. We also reject their first argument, repeated in the petition for rehearing, that their claim for fees is supported by the mere fact that summary judgment was entered by Judge Tully based solely on the admissions made by the defendant when he filed his answer to the Intervenors' complaint.

The Appellate Attorney also maintains in the petition for rehearing that we have ignored the fact that in the *Greer* case the supreme court held that the building as completed by Higginbottom was in violation of the Municipal Code. We concede that we did not attach particular significance to the ultimate result in *Greer* in our original opinion because the Intervenors also did not, either in the trial court or in this court. Indeed, the Trial Attorney told Judge Tully on June 10, 1985, that the *Greer* decision was irrelevant.[5] She said that, of course, when the attorney for the defendant asked the judge to take judicial notice of Judge Curry's ruling in favor of the defendant and the IHDA. The appellate court opinion had not yet been rendered in favor of the Intervenors.

At this juncture, it is appropriate that we discuss the *Greer* litigation and its history. Several property owners, like the Intervenors, living within 1,200 feet of the Building or other properties owned by Higginbottom in the area, filed a suit against the IHDA and Higginbottom. The suit against the IHDA challenged the agreement made by the IHDA to fund the building and the other properties. The suit against Higginbottom alleged that development of the Building and the other properties as proposed would violate the Chicago Building Code or the Chicago Rehabilitation Code. *The suit against Higginbot-*

---

[5]She told Judge Tully the same thing on June 30, 1985.

*tom also sought attorney fees.* The suit was filed in January 1985 and decided on March 23, 1985. Judge Curry granted the IHDA's motion for judgment on the pleadings; after a hearing he granted Higginbottom's motion for judgment at the close of the plaintiffs' case. There were five issues raised in the appellate court, including the question of whether the plaintiffs had standing. The principal claim against the IHDA was that it abused its discretion in granting section 8 housing assistance funds to Higginbottom.

The appellate court held that a question of fact existed in the claim against the IHDA and remanded the case for trial. It reversed the judgment in favor of Higginbottom, holding that the basement apartments of the Building were in violation of the Code. (*Greer*, 150 Ill. App. 3d 357.) The supreme court affirmed the appellate court. (122 Ill. 2d 462.) The case against the IHDA is pending in the circuit court. The case against Higginbottom is also pending subject to settlement negotiations. We have been informed that if settlement negotiations fail, the plaintiffs will seek attorney fees from Higginbottom.

Returning to the hearings in the case before us, we note that on February 6, 1984, the Trial Attorney said the following:

"I urge the court to rule on our petition to intervene. Your Honor knows we have a remedy in chancery. *We could go today, file a chancery, and on April 9 be back here as a consolidated case with this case.* We intend one way or the other to do that." (Emphasis added.)

In response to our questions at oral argument on the petition for rehearing, the lead attorney in the *Greer* case informed us that a motion to consolidate the *Greer* case with the case before us was not made because of the difference in issues and the difference in parties. It is our judgment that the cases could have been consolidated and the allegations of code violations made in *Greer* could have been made in this case.

Higginbottom had to wend his way through a bureaucratic maze of, at least, the Northeast Planning Commission, the City Building Department, the FHA, HUD and the IHDA. To illustrate, at one point the closing was delayed because of a dispute between the IHDA and HUD concerning the form of documents to be used. Higginbottom also had to appear in the *Greer* lawsuit and in the tax court. In their brief, the Intervenors tell us that the tax deed dispute caused a six-month delay.

The Intervenors have not suggested any reason why Higginbottom would delay rehabilitation. The record is bereft of any proof that delay would inure to his benefit. A fact finder could conclude Higgin-

bottom acted in good faith and reasonably expeditiously and that the activities of the SECC with the IHDA, the filing of the *Greer* case and the trial and the demolition order did cause some delay in the funding of the Building. Our recognition of those actions as causing some delay may not properly be construed as an infringement on the Intervenors' first amendment rights, as the Intervenors maintain in the petition for rehearing. No one may deny the right of the Intervenors to object to the IHDA, to participate in the *Greer* case, to seek a demolition order and in general to dispute the defendant's right to develop the property as he wanted. But we repeat what we said in our first opinion that the Intervenors cannot have it both ways.

The ramifications of an award under these facts are forbidding. Who would purchase abandoned or run-down property with the intent of rehabilitating the property, knowing that adjoining property owners could intervene and claim attorney fees because they allegedly hectored the owner to rehabilitate the property faster? Only the very rich or very venturesome. In our judgment, the salutary purpose of legislation encouraging the restoring of property to usefulness would be frustrated. (Ill. Rev. Stat. 1985, ch. 67½, par. 303.) We understate our conclusion when we hold the Intervenors have not proved their right to attorney fees as a matter of law.

The Intervenors rely on *Corkill Electric Co. v. City of Chicago* (1990), 196 Ill. App. 3d 838, 554 N.E.2d 1027. In that case, the Department of Zoning denied the plaintiff's application for zoning certification on the ground that its sign failed to conform with the municipal code. The plaintiff appealed the department's decision to the Zoning Board of Appeals. The Burnham Park Planning Board submitted a memorandum to the Board of Appeals arguing that the department's decision should be affirmed and the signs that had been erected should be removed. The Zoning Board of Appeals affirmed the department's decision. The plaintiff filed an administrative review complaint which included Burnham Park as a defendant. Burnham Park filed a counterclaim under section 11—13—15 of the Act. The circuit court affirmed the findings of the Zoning Board of Appeals but remanded the administrative review action to the Board for determination of whether the City was estopped from denying the plaintiff's application for zoning certification. It severed Burnham Park's counterclaim. The court granted summary judgment for Burnham Park, ordered the removal of the sign and granted attorney fees to Burnham Park. The appellate court affirmed with this observation:

"In the present case, it was the efforts of Burnham Park and not those of the city which resulted in the order to remove the

sign. Unlike *Launius,* here there was never any attempt made by the city to enjoin the violation. Burnham Park filed the only action seeking removal of the sign, and compliance with [the Code] was accomplished solely through the actions of Burnham Park. The city's participation in the proceedings was minimal, and there is no merit to Corkill's claim that Burnham Park's actions merely duplicated those of the city." 196 Ill. App. 3d at 849.

The facts of *Corkill* bear no resemblance to the facts of this case.

Because we hold that the Intervenors have failed to prove, as a matter of law, that they substantially contributed to the timely rehabilitation of the Building, it is unnecessary to pass on the defendant's alternative argument that fees should be denied because the Intervenors did not and were not required to pay any fees.

In view of what has occurred after our original opinion, this modified opinion may not be appropriately ended with a simple order of affirmance. The petition for rehearing and subsequent memoranda filed by the Intervenors beg for this court's response.

In the petition for rehearing, the Appellate Attorney for the Intervenors pointed out factual errors in our original opinion which we have corrected. She also expressed disagreement with some of our observations about statements made by the Trial Attorney. She told us that we had misconstrued the Trial Attorney's remarks about her relationship with the SECC and her answers to questions by Judge Bedoya. We have already discussed those matters in this modified opinion. She also pointed out a misunderstanding of a position taken by the Trial Attorney before Judge Tully. We have corrected that also.

The principal arguments advanced in the petition were that we had applied the wrong legal standard in holding that the Intervenors were required to substantially contribute to the defendant's rehabilitation of the Building and that we had ignored the fact that the supreme court in *Greer* had "held that Higginbottom's plan for rehabilitation of the Building violated the Building Code." In order to properly consider the argument that we had ignored the ultimate decision in *Greer,* we had to reexamine the record and the *Greer* opinions of the appellate and supreme courts. The petition for rehearing informed us that the complaint against the IHDA was still pending in the circuit court. It made no mention of the case against Higginbottom. We examined the circuit court record and noted that the complaint against Higginbottom also sought attorney fees.

Our reexamination of the record raised the thought, at least, that any argument that we should consider the results of *Greer* had been

waived; it also raised the question of the accuracy of other remarks, not previously noted, made by the Trial Attorney. We took the unusual step of allowing oral argument on the petition for rehearing. We asked that the Trial Attorney be present, and we told the Intervenors' Appellate Attorney that we deemed "it necessary to question counsel." Before we published an opinion, we wanted to give the Trial Attorney an opportunity to explain the remarks she had made to various judges and to give the Appellate Attorney the opportunity to explain what could be construed to be a waiver of the argument that we should consider the effect of the *Greer* opinion.

The appellate court opinion in *Greer* was first published on November 5, 1986, and, in part, held that the Building was in violation of the Building Code. At the time the parties appeared before Judge Tully on November 24, 1986, a building inspector testified that the Building was in compliance with the Code. He made a specific reference to the basement apartments and said that they were "allowed." At that time, the Trial Attorney was aware that the appellate court had rendered a decision 18 days before holding that the Building's basement apartments were not in compliance with the Code. She did not so inform Judge Tully. Similarly, she did not tell Judge Bedoya when she entered her order on September 29, 1989, that the supreme court on May 18, 1988, had upheld the appellate court's finding that the Building contained Code violations. With all these facts before us, we did not understand why the Trial Attorney did not speak up before Judge Tully when the building inspector testified. We also did not understand why such conduct could not be considered waiver of the argument now advanced by the Intervenors.

At oral argument on the petition on August 5, 1991, we referred to statements made by the trial attorney to Judge Tully that the *Greer* case was irrelevant. We expressed some misgivings about other answers that she had made to Judge Tully.[6] We asked questions of the Appellate Attorney seeking an explanation of why Judge Tully had not been informed of the existence of code violations on November 24, 1986. We asked why the *Greer* case had not been consolidated

---

[6]At the time she told Judge Tully that the *Greer* case was irrelevant, she said that the only issue in the *Greer* appeal was "standing" and that *Greer* did not involve section 8. The *Greer* appeal involved much more than standing, and it did involve section 8. The Appellate Attorney informed us in a later memorandum that Judge Tully would have known from having read transcripts from previous hearings that the *Greer* appeal involved more than standing; she also informs us that the Trial Attorney was not given a full opportunity to describe her views of the issues in *Greer*.

with this case; and we asked the Trial Attorney about her statement to Judge Bedoya that there was no agreement to "reimburse" the SECC.

After oral argument on the petition, the Appellate Attorney was given leave to file a memorandum in which she maintained that Judge Tully had been informed of the illegal condition of the Building and that "the Inspector testified that the condition had been corrected." The memorandum also pointed out that the defendant's 30-page trial memorandum filed June 5, 1989, in opposition to the claim for fees included that part of the Trial Attorney's deposition in which she said that the SECC would be "reimbursed." Since Judge Bedoya acknowledged that she had read the "pleadings and memorandum filed in support and response thereto," the Intervenors argued, Judge Bedoya was aware that the SECC would be "reimbursed," despite the Trial Attorney's answer to Judge Bedoya's question that the SECC would not be "reimbursed"; therefore, Judge Bedoya was not misled.

The memorandum asserted that the court's opinion and the questions asked by the author of this opinion at oral argument on the petition for rehearing "suggest that the Court believes (i) that [the Trial Attorney] misled the trial court by statements she made and (ii) *that such a view has influenced this Court's decision on the merits of this appeal.*"[7] (Emphasis added.) The memorandum concluded that we had raised questions about the Trial Attorney's conduct *sua sponte* and that, if we believe she had misled the trial court, we should remand the case "for an evidentiary hearing *** after which a trial judge will enter findings, and if necessary, an appeal will be taken."

After reading that memorandum, we concluded that it raised more questions. The author of this opinion informed the parties by letter that if the Building was in compliance with the Code on November 24, 1986, it necessarily followed that the Building was in compliance all during the proceedings in the supreme court, which was called upon to decide the issue. We referred particularly to page 517 of the supreme court opinion:

> "We acknowledge that the grant of equitable relief may depend in part on the changed circumstance that the project has now actually been built. However, the appellees indicate in their brief that they are not requesting that the building be de-

---

[7]We do not regard this statement as contumacious. We recognize that judges must be made of sterner stuff. We need not be so stern, however, that we are insensitive to "unlawyerlike rudeness." *In re Snyder* (1985), 472 U.S. 634, 647, 86 L. Ed. 2d 504, 514, 105 S. Ct. 2874, 2882.

molished for noncompliance with the codes, *but only that the basement apartments be vacated.* In any case, the trial court on remand will be free to fashion appropriate relief." (*Greer*, 122 Ill. 2d at 517.) (Emphasis added.)

It appeared to us that, if the Building was not in violation on November 24, 1986, the Intervenors' claim that they should be credited for disclosing (and correcting) a building violation through their *Greer* activities was invalid. We asked the following questions of both sides:

(1) What was the date that the Building's alleged violation in *Greer* was finally corrected?

(2) If it was corrected before November 24, 1986, why was the supreme court not notified that it had been corrected and that the issue, therefore, should be removed from their consideration?

(3) Do you agree that if the violation was corrected before November 24, 1986, the issue was moot in the supreme court?

(4) If not, why not?

We also referred to the Intervenors' claim that Higginbottom had made misrepresentations and asked for references to the record. Last, we informed the Intervenors that we did not know of any procedure, other than in contempt actions, whereby trial courts conduct hearings to determine whether an attorney has made misleading statements.[8] The only tribunal we were aware of which could properly investigate, conduct hearings and impose disciplinary sanctions is the Attorney Registration and Disciplinary Commission. We invited the Intervenors to refer us to any precedent supporting a remanding order from a reviewing court to a trial court for the purpose of conducting a hearing such as was suggested by the Intervenors.

The defendant answered by letter. The Appellate Attorney filed a memorandum. The Appellate Attorney informed us that the Intervenors know only that the original rehabilitation plan provided for below grade construction of the apartments and that some time in the rehabilitation process the prospective violation was corrected before November 24, 1986. They did not inform the supreme court of changes made in the Building because "[r]esponsibility for informing the [supreme court] of changes made in the Woodlawn Building after the trial court proceeding had concluded rested with the Defendants." The Intervenors did not believe the issue was moot because the "*Greer* plaintiffs had caused the Building Code violation in the base-

---

[8]Supreme Court Rule 137 (107 Ill. 2d R. 137) is not applicable because it refers to sanctions against attorneys for false pleadings.

ment to be corrected by bringing the matter to the court's attention in the first place." That issue was still to be decided in determining the question of attorney fees.

We interpret the defendant's answer to be that the Building as acquired was in violation but the violation was corrected in the construction process. Consequently, the Building as rehabilitated was never in violation. The defendant's attorney believed the issue of any violation of the basement apartments was moot but did not inform the supreme court because "Higginbottom could not unilaterally determine an issue to be moot, add to the record, or otherwise take the steps available to the *Greer* appellees to remove the issue from the supreme court's consideration." He added that he had advised the supreme court that orders of full compliance had been entered.

We conclude that both sides had an obligation to inform the supreme court that the question of any violation of the Code should be removed from their consideration. In view of the Intervenors' claim now that the *Greer* plaintiffs had caused the Building violation in the basement to be corrected by bringing the matter to the court's attention in the first place, we cannot say that the question is moot. We refrain from expressing any opinion of the Intervenors' chances of establishing that claim. However, we can say this: Any argument that we should consider the holding of the supreme court in *Greer* that the Building was in violation as support for the Intervenors' claim for fees is baseless, if not frivolous.

The Intervenors have persistently accused Higginbottom of making misrepresentations in the trial court.[9] It is appropriate to address this issue in more detail and to put it to rest. On August 15 Higginbottom's attorney told Judge Sulewski that his client's application for funding by HUD had been recommended by the Northeast Planning Commission and had been tentatively approved. On October 17, 1983, the following occurred before Judge Sulewski:

> "DEFENDANT'S ATTORNEY: Your Honor, Mr. Higginbottom is prepared to testify that the Department of Housing and Urban Development has yet to act on his application. However, he has obtained permit, has drawings, and is prepared to pledge personal assets to complete the rehabilitation of 4710 South Woodlawn, and will also testify that the rehabilitation

---

[9]We asked the Appellate Attorney for references to the record which would establish personal misrepresentations by the defendant. The Appellate Attorney's response informed us that she had not combed the record. She reminded us that this case involved the Adjoining Property Owner's Act, not Supreme Court Rule 137.

should take approximately one year.

\* \* \*

THE COURT: When do you anticipate that the funding might be coming through?

DEFENDANT'S ATTORNEY: Your Honor, the HUD funding is, as I understand it, still uncertain. Construction is scheduled to begin within two weeks and we will proceed in an orderly workman-like fashion until the rehabilitation is done which should be approximately one year from now."

On January 9, 1984, it was established that the Building was 80% gutted. When the parties appeared on April 9, 1984, the judge wanted to know the anticipated time of financing approval. The following occurred:

"DEFENDANT'S ATTORNEY: Mr. Higginbottom received preliminary approval in February shortly after we were here. One of their problems in doing federal finances is that you really can't start construction until such time as they have completed your financing. I would expect in the next four months we would have complete financing. We have made our application for firm commitments.

MR. HIGGINBOTTOM: This is such a neighborhood that we are building sections—doing a hundred Section 8 projects in this area, and I'd just like to show the Court this is a building that was in your court that we rehabilitated.

THE COURT: I think it was stated that there would be no problem here with any kind of long-term application for financing, that you were able to handle this.

MR. HIGGINBOTTOM: I could finance the building, but if I finance the building out of my cash reserves, Your Honor, that would reduce my ability to do other things. I have a Section 8 contract which the people in the community oppose. If they wouldn't oppose it, I would have been four of [or] five months ahead of where I am now. And, the only reason they oppose it is because they don't—there's a hundred section 8's in there."

It is the Intervenors' position that Higginbottom, through his attorney, misrepresented that he would use his own financing. In our judgment the Intervenors' accusation of misrepresentation against Higginbottom is unfortunate and unfair. That is our judgment despite any remarks made by any trial judge. His lawyer said that Higginbottom would put up his own money if public funding was unavailable. Public funding may have been slow in coming, but it was not unavailable, as proved by subsequent events. His position on April 9 that he

did not want to use his own money was forthright and understandable.

The Intervenors also maintain that Higginbottom made a misrepresentation when he told the court that he would have windows installed. On February 6, 1984, Higginbottom told Judge Sulewski that he had ordered windows in January, that he was awaiting delivery and that the windows should be installed within four or five weeks. On June 11, Judge Sulewski said that he remembered something about windows being ordered and Higginbottom answered, "Just never had them delivered. I went through with the order."

As late as September 4, 1991, in the memorandum submitted in response to our questions, the Appellate Attorney for the Intervenors pointed to those exchanges as proof that Higginbottom made misrepresentations. We agree with the defendant that this allegation of misrepresentation, like the allegation of misrepresentation about funding, is irrelevant. We also believe it is frivolous. We note that on September 10, 1987, when the Trial Attorney was asking that fines be imposed she also said, "And I'm sure that Mr. Higginbottom sincerely believed everything that he said when he said that the windows were on order and would very soon be installed ***."

■ The last part of our response to the Appellate Attorney's memorandum is directed to the criticism of this court for raising, *sua sponte*, questions about the representations made by the Trial Attorney and for asking questions of counsel without providing previous notice of those questions to counsel. We believe that criticism reflects a misunderstanding on the part of the Appellate Attorney of the relationship between a lawyer and the court and the powers and duties of the court. A lawyer is an officer of the court and is always under an obligation to be truthful to the court. (*Woodson v. Phillips Petroleum Co.* (1985), 102 N.M. 333, 695 P.2d 483.) He has the duty of good faith and candor in dealing with the judiciary. (*United States v. Associated Convalescent Enterprises, Inc.* (9th Cir. 1985), 766 F.2d 1342.) He is obliged to answer the court's questions. *White v. Sadler* (1957), 350 Mich. 511, 87 N.W.2d 192; *Gottwals v. Rencher* (1940), 60 Nev. 35, 98 P.2d 481.

■ A reviewing court, like a trial court, is not simply an umpire and is responsible for the justice of the judgment that it enters. (*Wozniak v. Segal* (1974), 56 Ill. 2d 457, 308 N.E.2d 611.) We regard it to be our obligation to bring to light what appear to be inconsistent statements by an attorney and to question the attorney. And we will not be discouraged from doing so by the prospect of sarcastic and disrespectful comments by counsel. Nor are we impressed by the Appel-

late Attorney's implied argument that all is well if an attorney makes an incorrect statement to a judge so long as the judge may, or should, be aware of another correct statement made by the attorney. Finally, and briefly, the argument that a court must give counsel previous notice of questions it intends to ask is preposterous.

■ We invited the Appellate Attorney to provide us with any authority that would permit us to remand to a trial court the matter of the Trial Attorney's statements. She has not provided us with any such authority. It is the law of this State that the sole authority to impose disciplinary sanctions on attorneys is with the supreme court, and the appropriate forum to investigate the conduct of an attorney and conduct hearings is the Attorney Registration and Disciplinary Commission. *People v. Camden* (1991), 210 Ill. App. 3d 921, 569 N.E.2d 312.

The petition for rehearing is denied; the judgment of the circuit court is affirmed.

Judgment affirmed.

RAKOWSKI, P.J., and LaPORTA, J., concur.